UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ILAPAK, INC., and<br>ILAPAK INTERNATIONAL S.A.,<br>    Plaintiffs,<br><br>    v.<br><br>EDWARD J. YOUNG, PFM NA – US<br>DIVISION, INC., and SCOT CHIN,<br>    Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | No. 5:20-cv-01877 |

**O P I N I O N**
Plaintiffs' Motion for a Preliminary Injunction, ECF No. 4 — Granted

Joseph F. Leeson, Jr.                                                                                      May 29, 2020
United States District Judge

**I.     INTRODUCTION**

Plaintiff Ilapak filed a complaint, motion for a temporary restraining order, and motion for a preliminary injunction due to numerous allegations of unfair competition and breach of fiduciary duty against Defendants on April 13, 2020. The allegations stemmed from Defendants Edward Young and Scot Chin departing Ilapak and becoming employed by Defendant PFM NA – US Division. The Court granted the motion for a temporary restraining order, and now the motion for a preliminary injunction is ready for review. For the following reasons, the motion for a preliminary injunction is granted as follows.

**II.    BACKGROUND**

    **A. Ilapak business background**

Ilapak is a company that distributes packaging machinery and customized packaging solutions to and for customers throughout the United States in industries such as dairy, bakery,

produce, meat, poultry, pharmaceuticals, medical supplies, wet wipes, and frozen items. *See* Flanagan Aff. ¶ 3, ECF No. 4-3.

Due to the competitive nature in which Ilapak operates, it has developed and maintains information concerning, amongst other things, industry segments, products, including current and future product specifications, proprietary technology advancements and other intellectual property, strategic partnership information, sales and marketing strategies, financial records and information, client lists, key account lists, prospective client lists, project lists, client strategies, current and future projects and proposals, contact information for personnel, and planning and strategy information for current and future personnel ("Confidential Information"). *Id*. at ¶ 6. Ilapak considers this information to be trade secrets. *Id*. at ¶ 7.

Ilapak has taken measures to maintain the secrecy of the Confidential Information, as well as to protect against the use and exploitation of Ilapak's customer relationships, including:

1. Requiring employees at the time of hire to review and acknowledge the Ilapak employee handbook which includes a confidentiality policy.

2. Requiring employees to sign a non-disclosure agreement.

3. Implementing a policy prohibiting VPN access to local servers except in special circumstances approved by management and IT.

4. Maintaining ownership and control over all electronic devices used by Ilapak employees in the performance of their job responsibilities.

5. Issuing unique log-in credentials to each employee who has access to the Confidential Information.

6. Investing in and maintaining proprietary software to house all customer data, projects, and proposals, access to which is password protected and limited to only certain employees on a need-to-know basis.

7. Investing in and maintaining company-wide cloud-based storage accounts and strictly prohibiting employees from using personal cloud accounts.

> 8. Requiring employees with access to the Confidential Information and/or who develop relationships and goodwill with Ilapak customers (e.g., management and sales employees) to execute non-competition agreements.

*Id*. at ¶ 9.

Ilapak believes it must protect this information as it operates in an industry where it is vying for the same customers offering the same products as the competition. *Id*. at ¶ 5. Thus, due to the similarities, Ilapak believes relationships are vital as positive relationships develop goodwill which generates recurrent sales and reputational enhancement in the industry. *Id*. at ¶ 8.

Young and Chin, as employees of Ilapak, were aware of their confidentiality obligations to Ilapak. *Id*. at ¶ 15. They acknowledged their understanding of Ilapak's confidentiality policy, via signature, including that:

> No employee will store information outside of the company (either in written or electronic form) about any matter pertaining to the conduct of the company's business. No information regarding the purchase prices of Ilapak shall be given to any customer, competitor, or vendor.

*Id*., Ex. A. However, Young and Chin were not signatories to Ilapak's non-competition agreement because only new hires were subject to the non-competition agreement. Young Decl. ¶ 20; ECF 32-2. Additionally, neither Young nor Chin were subject to any non-solicitation agreements. *Id*. at ¶ 17.

### B. Young's employment with Ilapak and subsequent departure

Young was employed by Ilapak for over thirty years. Flanagan Aff. ¶ 11. He ultimately rose to the position of CEO of Ilapak and managing director of the Ilapak Group. *Id*. At Ilapak, Young was responsible for making strategic decisions, managing the sales team, and all other matters bearing on the conduct and success of the business. *Id*. at ¶ 11. He was terminated from his employment on October 2, 2019. *Id*. at ¶ 22. Upon learning of his termination on October 2,

2019, Young proceeded to delete the vast majority of the data on his company-issued laptop, including the Confidential Information, company documents, other electronically stored information, before returning the property to Ilapak. *Id*. at ¶ 23. However, Young asserts Ilapak recommended to employees to back up their work files on their personal computers, which Young asserts he did and claims other employees did so as well. Young Decl. ¶ 34, 35.

After leaving Ilapak, Young executed a Waiver and Release Agreement on January 9, 2020. Flanagan Aff. ¶ 29, Ex. 7. The Waiver and Release Agreement includes confidentiality restrictions and a nondisparagement provision. *Id*. The confidentiality provision prohibits Young from retaining any Confidential Information, using or disclosing the Confidential Information, or allowing the Confidential Information to be stored or saved on any electronic device or account, including cloud-based accounts, outside Ilapak's control. *Id*., Ex. 7, § 7. Young also agreed he would not "disparage Ilapak and/or [Ilapak] International and or the [Ilapak] Group or other Releases [identified in the Waiver and Release], their products or services or their officers, directors or employees in any way orally or in writing." *Id*. at § 6.

Due to a lack of a non-solicitation or non-competition agreement, Young, once hired as PFM's President and CEO, recruited and solicited Ilapak sales and technician employees, including Chin, Aaron Black and Albert Cogliati, to take employment with PFM. *Id*. at ¶ 25.

**C. Chin's employment with Ilapak and subsequent departure**

Chin was employed by Ilapak as a sales manager. *Id*. at ¶ 13. As sales manager of Ilapak, Chin was assigned to a large sales territory. *Id*. at ¶ 16. Chin was assigned to the "Northeast" territory of the United States, which included all of Connecticut, Delaware, Kentucky, Massachusetts, Maryland, Maine, New Hampshire, New York, Ohio, Pennsylvania, Rhode Island, Virginia, Vermont, West Virginia and even Puerto Rico. *Id*. Prior to that position, Chin

was employed as vice president of sales. *Id*. at ¶ 14. Chin reported directly to Young throughout his employment. *Id*. at ¶ 13.

Chin resigned from his employment on January 2, 2020, which was effective on January 3, 2020. *Id*. On the day Chin resigned, he backed up his work files onto his personal computer. Chin Decl. ¶ 14; ECF 32-1. Similar to Young, Chin believed Ilapak encouraged employees to back up their work files onto their personal computers and thought it was common practice at Ilapak. *Id*. at ¶ 15. In the immediate aftermath of leaving the employ of Ilapak, Chin began employment as a sales manager with PFM. Flanagan Aff. ¶ 31.

**D. Chin and Young's involvement with Pita Express**

Ilapak accused Chin and Young of successfully soliciting and diverting Ilapak customer, Pita Express, to PFM. *Id*. at ¶ 40. Specifically, in the fall of 2019, while Chin was still employed with Ilapak, Joe Banhamo, the owner of Pita Express, called Chin regarding potentially purchasing equipment to wrap pita bread in plastic-wrap. Chin Decl. ¶ 38. Neither Banhamo nor Pita Express had a preexisting relationship with Ilapak or had ever previously purchased anything from Ilapak. *Id*. at ¶ 39. However, in email dated November 20, 2019, Chin emailed Banhamo regarding their "verbal order." *See* ECF No. 46. The email chain continues with pricing and equipment information with a sales proposal for Banhamo's signature. *Id*.

After Chin joined PFM, he followed up with Banhamo to see if he was still interested in purchasing a plastic-wrapping machine and, if he were, to offer him a suitable PFM machine. Chin Decl. ¶ 43. Banhamo reiterated his interest, and, in February 2020, Chin ultimately sold him a PFM "Pearl" wrapping machine for $62,712. *Id*. at ¶ 44. Ilapak was notified of this sales transaction because Young mistakenly sent a congratulatory email to the PFM sales team to his

old Ilapak email address. Flanagan Aff. ¶ 40. *Id*. This occurred on or about February 10, 2020. *Id*.

### E. Chin and Young's involvement with Plant Automation

On January 2, 2020, the same day that Chin resigned from his employment with Ilapak, Chin sent two emails to Young from his Ilapak email account forwarding Confidential Information about projects Ilapak was working on for customer Plant Automation. *Id*. at ¶ 32. In one of the emails, Chin advised Young to "get a LD quote out for this application" and in the other email asked Young to "pass [ ] on" the proposal in the forwarded email." *Id*.

Specifically, the first email chain contained a December 16, 2019 email and December 31, 2019 follow-up email from Dan Coakley at Plant Automation regarding a request for a proposal. *See* Chin Decl. ¶ 25. The second chain starts with another email from Coakley dated September 16, 2019, asking Chin about the status of a proposal for a Plant Automation customer. *Id*. at ¶ 31.  Chin responded with a proposal for that company's requirement on September 19, 2019. *Id*. at ¶ 32. Defendants admit the September 19, 2019 email and attached proposal did contain information that came from Ilapak, as well as publicly available information. *Id*. at ¶ 32.

### F. Beginning of litigation

Upon suspicion of violating of Waiver and Release Agreement, Ilapak issued a cease and desist to Young on January 16, 2020, demanding that he cease all conduct in violation of the Waiver and Release, including his use of Confidential Information and disparaging statements and immediately return all Confidential Information in his possession to Ilapak. *Id*. at ¶ 30.

After performing a forensic analysis, Ilapak filed suit on April 13, 2020. *See* ECF No. 1. That same day, Ilapack filed a motion for a temporary restraining order and a motion for a preliminary injunction. *See* ECF No. 4. The Court granted the temporary restraining order on

May 1, 2020. *See* ECF No. 14. After being served with the complaint and motions, Defendant hired their own forensic examiner, and the forensic examiner has precluded access to Young and Chin's devices that might contain the Confidential Information. Schery Decl. ¶¶ 3, 7, 11; ECF No. 32-3. Now, the motion for preliminary injunction is ready for review.

## III.   LEGAL STANDARD

### A. Preliminary injunction standard

The standard for granting a preliminary injunction requires a plaintiff seeking such relief to make a "clear showing" that "[1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an injunction is in the public interest." *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008)); *see also Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010).

## IV.   ANALYSIS

### A. The likelihood of success on the merits

Pennsylvania courts recognize a common law claim of unfair competition under the Restatement (Third) of Unfair Competition. *ID Security Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 688 (E.D. Pa. 2003); *Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F. Supp. 617, 668 (E.D. Pa. 1997); Restatement (Third) of Unfair Competition § 1 (1995). Under the Restatement:

> One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless . . . the harm results from . . . other acts or practices of the actor determined to be actionable as an unfair method of competition.

*Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 526 (E.D. Pa. 2008). A cause of action for unfair competition can be alleged where "there is evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information." *Synthes (U.S.A.) v. Globus Med., Inc.*, No. 04-1235, 2005 WL 2233441, at *14 (E.D. Pa. Sept. 14, 2005).

Courts have found "trade secrets" to include "certain business and marketing information including the costing and pricing information of an employer's product or services, an employer's business plans, marketing strategies, and financial projections and the terms of specific customer accounts including contract expiration dates and revenues generated." *BIEC Intern., Inc. v. Global Steel Services, Ltd.*, 791 F. Supp. 489, 545 (E.D. Pa. 1992) (citing *SI Handling Sys, Inc. v. Heisley*, 753 F.2d 1244, 1260, (3d Cir. 1985) (protecting cost and pricing information for the final product)); *see Union Carbide Corp. v. UGI Corp.*, 731 F.2d 1186, 1191 (5th Cir. 1984) (applying Pennsylvania law to protect marketing information and strategies); *Air Products and Chemicals, Inc. v. Johnson*, 442 A.2d 1114, 1121 (1982) (protecting business plans and financial projections); *Alexander & Alexander, Inc. v. Drayton*, 378 F. Supp. 824, 833 (E.D. Pa.), *aff'd*, 505 F.2d 729 (3d Cir. 1974) (protecting the terms of specific customer accounts). "Customer lists and confidential business information cannot be trade secrets if they are easily or readily obtained, without great difficulty, through some independent source other than the trade secret holder." *BIEC Intern.*, 791 F. Supp. at 545. A compilation of data that has independent economic value can be protected as a trade secret. *Amerisourcebergen Drug Corp. v. Am. Associated Druggists, Inc.*, No. 05-5927, 2008 WL 248933, at *25 (E.D. Pa. Jan. 29, 2008) (citing *Nat'l. Risk Mgmt., Inc. v. Bramwell*, 819 F. Supp. 417, 430–31 (E.D. Pa. 1993) (holding

that customer information, such as costing and price information, compiled by a business represents a material investment of time and money and constitutes a valuable asset)); *see Morgan's Home Equip. Corp. v. Martucci*, 136 A.2d 838, 842–43 (1957) (holding that customer data on, and confidential route of, door-to-door salesmen's customers were entitled to protection as trade secrets).

Ilapak has demonstrated a likelihood of success as to their common law unfair competition claim as Young and Chin have attempted to induce Ilapak's clients while in the possession of Ilapak's Confidential Information, and, additionally, in violation of Young's Waiver and Release Agreement with Ilapak not to use such confidential information. Specifically, this information entailed Ilapak's proprietary technology, intellectual property, sales and financial information of clients, and current and potential customer lists, all of which Ilapak protected through confidentiality agreements, having employees only using company technology to access confidential documents, and utilizing Ilapak's own proprietary software to house confidential information. Moreover, the record shows Young and Chin "wiped" their Ilapak laptops before returning them, and that Chin emailed Young sensitive sales information pertaining to a request for a proposal by Plant Automation. Furthermore, Chin, utilizing the Confidential Information of Ilapak, secured an agreement with Pita Express while at Ilapak, before ultimately securing the sale at PFM. Both individuals were aware of Ilapak's security measures and confidentiality policy as the confidentiality policy explicitly forbid Chin's conduct while he was an employee of Ilapak. While Young was no longer an employee of Ilapak, he was bound by his Waiver and Release Agreement which forbid him from utilizing Ilapak Confidential Information. The industry in which Ilapak and PFM operate is competitive in which

the businesses offer the same products to the same clients; therefore, relationships and goodwill are essential due to the similarities of products.

Defendants have argued the common law unfair competition claim is preempted by the Pennsylvania Uniform Trade Secrets ACT ("PUTSA"); however, tort claims that may or may not be preempted by PUTSA are not dismissed this early in the proceedings. *PNC Mortgage v. Superior Mortgage Corp.*, No. 09–5084, 2012 WL 628000 (E.D. Pa. Feb 27, 2012). Instead, the question of whether certain tort claims are preempted comes only after the jury has determined whether Defendants are liable for misappropriation of trade secrets. *Bro–Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 412 (E.D. Pa. 2009) (denying summary judgment on PUTSA claim and noting that "due to the displacing effect of [PUTSA], if and when any Defendants are found at trial to have misappropriated Purolite trade secret information, Purolite's other tort or restitutionary claims against them will be preempted to the extent such claims are predicated on misappropriation of trade secrets as opposed to confidential or proprietary information of other sorts"). Accordingly, Ilapak has demonstrated a likelihood of success as to their common law unfair competition claim.

**B. Likelihood to suffer irreparable harm**

As stated in the Court's May 1, 2020 Order granting the temporary restraining order, *see* ECF No. 13, the Court is mindful that the Third Circuit has held that "once a secret is revealed, there is nothing for an injunction to protect." *ACE Am. Ins. Co. v. Wachovia Ins. Agency Inc.*, 306 F. App'x 727, 732 (3d Cir. 2009) (citing *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92 (3d Cir. 1992)). But here, the issue is not merely disclosure of Ilapak's information, but its continued use. *ACE American* only addresses the prior use of a trade secret to issue a business decision, not future decisions. *See Am. Fin. Res., Inc. v. Money Source, Inc.*, No. 14-1651, 2014

WL 1705617, at *12 (D.N.J. Apr. 28, 2014) (distinguishing *ACE American* on the issue of the continued use of trade secrets to harm a company).

Here, the record shows that, while employed by Ilapak, Chin forwarded an email chain containing confidential information to Young for the Plant Automation request for a proposal. Chin Decl. ¶ 32. *See Campbell Soup Co.*, 977 F.2d at 92–93 (stating "an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm"). This was impermissible as Chin was aware of Ilapak's security measures and confidentiality requirements under their Confidentiality Policy and Young's Waiver and Release Agreement precluded use of Ilapak's confidential information. While still employed with Ilapak, Chin secured a "verbal order" with Pita Express utilizing the Confidential Information of Ilapak, only to secure the business of Pita Express once at PFM. At Ilapak, Chin used the Confidential Information to determine the needs of Pita Express. Moreover, both Chin and Young "wiped" their computers before leaving the employ of Ilapak. Defendants assert this was a custom amongst the employees of Ilapak; however, it was against official company policy to perform this action and currently leaves the Confidential Informational vulnerable for use against Ilapak. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263 (3d Cir. 2000) (stating where witness testified that if defendants used trade secrets they illegally obtained from BP in building their plant they would damage BP's reputation, its credibility and ability to license its technology, such injuries were difficult to calculate and money damages would be inadequate). Defendants assert their forensic expert has precluded access to Ilapak's information; but, there is no legal recourse if that policy changes or if Young and Chin attempt to circumnavigate Defendants' forensic expert. Thus, Ilapak's

confidential information may still be utilized against them in a competitive industry where reputations and goodwill matter due to the similarities of products and clients.

### C. The balance of equities

The balance of equities tips in Ilapak's favor and there will be no greater harm to the nonmoving party. Defendants will be free to pursue business so long as they do not utilize Ilapak's confidential information in pursuing that business. As Chin and Young were not subject to non-compete or non-solicitation agreements, they are free to solicit employees of Ilapak, or even customers or potential customers of Ilapak, so long as the Confidential Information is not utilized.

### D. The public interest

Lastly, the public interest favors such relief. *See Par Pharm., Inc. v. Quva Pharma, Inc.*, 764 F. App'x 273, 278 (3d Cir. 2019) (concluding "the public has a clear interest in ensuring fair business practices and safeguarding trade secrets"). The record establishes this is a competitive industry in which reputations matter due to the similar products. Thus, fair business practices and safeguarding trade secrets is in the public interest to promote competition.

## V. Conclusion

For the reasons stated above, Ilapak's motion for a preliminary injunction is granted. Defendants shall be precluded from utilizing Ilapak's Confidential Information against them.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge